UNITED STATES of America, Plaintiff-Appellee,

v.

David PUNCH, Defendant-Appellant.

No. 82–3549.

United States Court of Appeals, Fifth Circuit.

June 29, 1983.

Glass & Reed, Robert Glass, New Orleans, La. (Court-appointed), for defendant-appellant.

Robert T. Myers, Harry W. McSherry, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

## INTRODUCTION:

David Punch appeals his conviction for importation of marijuana and cocaine following the district court's denial of his motion to withdraw his prior guilty plea. We conclude that the district court's failure to adequately inform Punch of the nature of the charges against him requires automatic reversal of his conviction.

## FACTS AND DISPOSITION BELOW:

On December 15, 1980 government agents in Dulac, Louisiana seized the M/V ARTISTA and its cargo of 46,000 pounds of marijuana and 200 pounds of cocaine.[1] Punch, the registered owner of the M/V ARTISTA, was subsequently charged in a four count indictment with possession with intent to distribute marijuana (Count I), possession with intent to distribute cocaine (Count II), importation of marijuana (Count III), and importation of cocaine (Count IV).

At a pre-trial conference, Punch's lawyer presented the court with a proposal to settle the case by having his client plead guilty to Counts III and IV of the indictment. Punch's lawyer stressed, however, that Punch persisted in maintaining that he was

---

1. No cocaine was found in the seizure. The Government based its belief that cocaine was on board on alleged statements to that effect by Punch in pre-arrest conversations. Government agents took marijuana samples only from the outer parts of the bales; the cocaine was supposedly buried inside.

innocent of all charges, claiming that his ship had been used for criminal purposes without his authorization.

Although Punch believed that it was wrong for an innocent man to plead guilty, his lawyer later testified that he was able to convince him that, given the strength of the Government's case, it was in his best interest to enter a plea of guilty.[2] The district judge accepted the plea under the rule of *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), which permits the acceptance of a guilty plea even though the defendant persists in maintaining his innocence. The Government agreed to move for dismissal of the remaining counts at the time of sentencing.

Four days after he entered his plea, Punch was visited in jail by a probation officer assigned to prepare his pre-sentence report. In the course of the visit, Punch told the officer that he intended to withdraw his guilty plea. Since Punch's lawyer was on vacation at that time, Punch wrote a letter to the district judge informing him that he wished to withdraw the plea. Sentencing was postponed accordingly, and upon his return from vacation, Punch's lawyer filed a formal motion to withdraw the plea under Fed.R.Crim.P. 32(d).[3] After hearing oral argument, the court denied the motion and sentenced Punch to concurrent four year terms on Counts III and IV. The court relied on its discretionary power to deny the motion, reasoning that: (1) Punch was ably represented by counsel at the Rule 11 proceeding; (2) Punch was afforded every constitutional safeguard; and (3) all of the participants in the proceeding fully understood what was going on.

ANALYSIS:

*Core Concerns*

Punch argues on appeal that his conviction must be reversed because the district court failed to properly inform him of the elements of the offense to which he pleaded guilty. Rule 11(c)(1) of the Federal Rules of Criminal Procedure provides in pertinent part:

> Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, ... the nature of the charge to which the plea is offered.

Fed.R.Crim.P. 11(c)(1). In *United States v. Dayton*, 604 F.2d 931 (5th Cir.1979) (en banc), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), this Court set out a number of clear and definite guidelines governing the conduct of guilty plea hearings, and the standards for reviewing these hearings on appeal. In *Dayton*, we stated that: (1) The requirement that the judge personally inform the defendant of the nature of the charge against him, and determine that he understands it, is a "core concern" of Fed.R.Crim.P. 11. (2) The entire failure by the court to address this core concern requires automatic reversal under *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). (3) In some cases, mere failure to adequately address this core concern may authorize further examination of the alleged omission in

---

**2.** In an affidavit submitted subsequent to the Rule 11 proceeding, counsel stated that:

> [A]t the time Mr. Punch authorized [counsel] to proceed with the *Alford* plea, [counsel] believed that Mr. Punch had reached a personal decision to enter the *Alford* plea under the argument and guidance presented to him by counsel. [Counsel] now cannot say that in his efforts to persuade Mr. Punch to the course of action counsel believed to be wisest, he did not in fact overwhelm and overcome by a lawyer's logic Mr. Punch's personal and emotional commitment to force the government to prove his guilt, and not to acquiesce in that finding. [Counsel] believes that it is the lawyer's position to guide, but

only the defendant's right to decide, whether or not to enter a plea of guilty, and that [counsel] cannot say to a convincing certainty that the balance has been held true in this case.

**3.** Federal Rule of Criminal Procedure 32(d) provides:

> (d) *Withdrawal of Plea of Guilty.* A motion to withdraw a plea of guilty or of *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea.

light of the harmless error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). (4) For simple charges, "a reading of the indictment, followed by an opportunity given the defendant to ask questions about it, will usually suffice" to discharge the judge of his obligation to personally inform the defendant of the nature of the charge against him. (5) Charges of a more complex nature may require further explanation. *Dayton,* 604 F.2d at 939.

In *Dayton,* defendants pleaded guilty to charges of possessing a controlled substance with intent to distribute. The district court judge in that case read them the relevant counts of the indictment:

[COUNT 19]

That on or about August 15, 1976, in the Western District of Texas, [defendant] did unlawfully, *knowingly and intentionally* possess with intent to distribute approximately six hundred pounds of marihuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

. . . .

[COUNT 28]

That on or about December 7, 1976, in the Western District of Texas, [defendant] did unlawfully, *knowingly and intentionally* possess with intent to distribute approximately one thousand pounds of marihuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

*Id.* at 941 (emphasis added). The judge then went on to ask defendant whether he understood these charges:

All right, Mr. Dayton, do you understand the nature of the charges that have been made against you in Counts 19 and 28?

MR. DAYTON: Yes, sir.

THE COURT: Mr. Dayton, any question about it?

MR. DAYTON: No, sir.

*Id.* In *Dayton,* we held that "the reading of this indictment, followed by an offer by the judge to answer any questions Dayton might have about it, was a satisfactory and sufficient explanation of the nature of this charge. His response that he understood and had no questions... was likewise a sufficient assurance in these circumstances." *Id.* at 943. *See also United States v. Sanchez,* 650 F.2d 745, 748 (5th Cir.1981) (the district attorney's reading of the indictment and the opportunity given by the district court for defendant to ask questions constitutes sufficient compliance with Rule 11(c)(1)).

■■■ The indictments handed down in the present case, like those read in open court in *Dayton,* simply and unambiguously set forth the nature and elements of the charges lodged against defendant. Counts III and IV are reproduced below.

COUNT III

On or about December 15, 1980, in the Eastern District of Louisiana, David Punch *knowingly and intentionally* did unlawfully import into the United States and into the customs territory of the United States from a place outside thereof, approximately 45,711 pounds of marijuana, a Schedule I controlled substance, said marijuana having been aboard the M/V ARTISTA; all in violation of Title 21, United States Code, Section 952(a) and Title 21, United States Code, Section 960(a)(1).

COUNT IV

On or about December 15, 1980, in the Eastern District of Louisiana, David Punch *knowingly and intentionally* did unlawfully import into the United States and into the customs territory of the United States from a place outside thereof, approximately 200 pounds of cocaine hydrochloride, a Schedule II narcotic controlled substance, said cocaine having been aboard the M/V ARTISTA; all in violation of Title 21, United States Code, Section 952(a) and Title 21, United States Code, Section 960(s)(1).

(Emphasis added). In the present case, however, neither the judge nor the district

attorney ever read these charges to the defendant. We reproduce below relevant excerpts from the transcript of the colloquy between the court, the district attorney, Punch and his counsel at the Rule 11 proceeding:

> THE COURT: I want you then to in addition to that, to inform Mr. Punch of the specific counts of the indictment. *You don't have to read them in full,* but I think it's important that he understands.
>
> [DISTRICT ATTORNEY]: You are charged in a four count indictment. Counts one and two charge you with possessing approximately 45,000 pounds of marijuana, possessing approximately 200 pounds of cocaine hydrochloride, with intent to distribute. *Counts three and four charge you with the importation of these substances into the United States, count three charges the importation of the marijuana and court [sic] four charging [you] with the importation of cocaine.* Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: I understand from the statement that your attorney has made to me and the pleadings that he has filed and his discussions with me in the presence of the U.S. attorney, that you do not specifically acknowledge your guilt with respect to the charges here, but that you do acknowledge the clear fact that the Government has the proof of your guilt, is that a fair statement of your feeling about this matter at this time?
>
> THE DEFENDANT: *In a way, but I had no knowledge of that, you know.*

> THE COURT: Is it my understanding correct [sic] that you feel that the Government's ability to prove their case is so strong that you feel that it is in your interest to enter this plea at this time?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Is that a fair statement?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you know what I'm talking about?
>
> THE DEFENDANT: I know what you are talking about now.

(Emphasis added). The record thus reveals that the judge did not have the district attorney read Punch the indictment setting forth the elements of the offense with which he was charged.[4] Instead, Punch was read an abbreviated version of the indictment, which noticeably failed to mention a most crucial element of the two offenses; the requirement that Punch *knowingly and intentionally* imported controlled substances into this country. This element is especially critical in light of the fact that Punch strongly protested his innocence of these charges, maintaining before, during and after these proceedings that he did not know that his ship was being used to import marijuana and cocaine into the United States.[5]

Although *Dayton* tells us that in complex cases, a judge in a Rule 11 proceeding must do more than have the indictment read to the defendant, *Dayton* clearly states that in non-complex cases, a reading of the indictment "will usually suffice." *Dayton,* 604 F.2d at 938. Nowhere in *Dayton* do we find any intimation that anything *less than* a reading of the indictment will ever suffice in cases like this one; indeed, the statement

---

**4.** Under the teachings of *Dayton* and *United States v. Sanchez,* 650 F.2d 745, 748 (5th Cir. 1981), the judge need not personally read the indictment to the defendant; it is enough if this is done before the judge at his direction. As we said in *Dayton,* "Judges, too, get sore throats." *Dayton,* 604 F.2d at 938.

**5.** There is no indication that Punch is trying to play both sides of the fence by pleading guilty, finding out his sentence, and then withdrawing his plea in the hope of receiving a lighter sentence at trial. Punch sought to withdraw his plea long before he was sentenced, in full compliance with Fed.R.Crim.P. 32(d). *See* note 3, *supra.* The general rule in this Circuit is that "Rule 32(d) should be construed liberally in favor of the accused when a motion is made to withdraw before sentence is imposed." *United States v. Presley,* 478 F.2d 163, 167 (5th Cir. 1973). *See also Kadwell v. United States,* 315 F.2d 667, 670 (9th Cir.1963).

that a reading of the indictment "will usually suffice" clearly implies that in some cases involving simple charges, even a reading of the indictment will not be enough.[6] Although Punch did acknowledge in response to a separate inquiry by the court that he had had the opportunity to go over a copy of the indictment with his attorney, *Dayton* nowhere indicates that a judge may satisfy his obligation to inform the defendant of the nature of the charges against him by relying on representations by defense counsel that he has informed his client of these charges. In *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), the Supreme Court held that counsel's statement that he explained the nature of the charges to defendant did not absolve the judge of his personal obligation to inform the defendant of the nature of those charges. *McCarthy*, 89 S.Ct. at 1173; *Id.* 89 S.Ct. at 1176 (Black, J. concurring). Although a judge may have the district attorney read the indictment to the defendant in the judge's presence, instead of reading it to the defendant himself, a judge cannot personally assure himself that a defendant understands the nature of the offense with which he is charged without ensuring first-hand that both he and the defendant know what those charges consist of.[7] Where some of the elements of the offense remain unstated, misunderstandings are likely to occur. *United States v. Roberts*, 570 F.2d 999, 1011 (D.C. Cir.1977) ("Whenever the Rule 11 disclosure is incomplete, there is a possibility of a misunderstanding; and whenever this possibility is present and the defendant before sentencing claims that it was a reality, the courts should be loathe to deny an accused his right to trial.") *aff'd*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). We believe that such a misunderstanding occurred here. In response to the judge's question whether he acknowledged that the Government had strong proof of his guilt, Punch said: "In a way, but I had no knowledge of that, you know." This statement should have alerted the judge to the fact that he

---

**6.** This does not mean that in a simple case in which a reading of the indictment would normally suffice, a judge must always have the indictment read in its literal form. Where a judge instead explains all the elements of the offense to the defendant, furnishing him with at least as complete an understanding of the charges as he would obtain from hearing the indictment read, the indictment need not be read as well. Neither of these procedures was followed in this case.

Whether something more than a mere reading of the indictment is required depends on the judge's determination of "the relative difficulty of comprehension of the charges and of the defendant's sophistication and intelligence." *Dayton*, 604 F.2d at 939.

**7.** It is crucial that a judge ensure that the defendant fully understands the charges against him.

A defendant who enters [a guilty] plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For this waiver to be valid under the Due Process Clause, it must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019 [1023], 82 L.Ed. 1461 (1938). Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.

*McCarthy*, 89 S.Ct. at 1171. See also *United States v. Jack*, 686 F.2d 226, 230 (5th Cir.1982) (no Rule 11 violation where indictment read in open court, and defendant stated he had discussed the charges with counsel and understood them); *United States v. Rodriguez-DeMaya*, 674 F.2d 1122, 1126 (5th Cir.1982) (no Rule 11 violation where prosecutor read the indictment and explained it to defendant, and district court judge went over the charges and the penalty with the defendant). A judge cannot merely assume that the defendant understands the charges against him. As we stated in *Dayton*:

What is necessary is that the trial court, given the nature of the charges and the character and capacities of the defendant, *personally participate* in the colloquy mandated by Rule 11 and satisfy himself fully that, within those limits, the defendant understands what he is admitting and what the consequences of that admission may be, as well as *that what he is admitting constitutes the crime charged,* and that his admission is voluntarily made.

*Dayton*, 604 F.2d at 943 (emphasis added).

and Punch were on different wavelengths. Since Punch was not properly informed that knowledge was an element of the offenses, and maintained his innocence throughout the proceedings,[8] his response may plausibly be construed as revealing his ignorance either that knowledge was an element of the offense[9] to which he pled guilty, or that the Government had the burden of proof on knowledge. At the very least, his answer reveals considerable confusion on his part. Had the judge responded to Punch's hesitation by explaining to him that the Government bore the burden of proving beyond a reasonable doubt that he knowingly committed the alleged offense, or by asking Punch to explain what he meant by his response, he could have cleared up the misunderstanding which caused Punch to seek to withdraw his plea shortly thereafter.[10]

▄▄▄▄ Although excellent reasons exist for permitting an *Alford* plea,[11] the logic underlying this type of plea is counter-intu-itive. The average defendant may have some difficulty reconciling himself to the notion of pleading guilty while maintaining his innocence. Personal moral and ethical considerations may lead a person who genuinely believes he is innocent of any wrongdoing to seek to vindicate his innocence despite strong proof of guilt. It is essential that a court accepting an *Alford* plea make every effort to ensure that a defendant recognize precisely what his plea entails. Strict compliance with the *Dayton* requirement that the indictment at least be read to the defendant at the judge's direction will go a long way toward ensuring that the defendant is fully informed of the nature of the charges against him.[12]

## Harmless Error

In *Dayton,* we noted that although the entire failure by the court to address a core concern was inherently prejudicial and required automatic reversal of the conviction,

---

8. *See McCarthy,* where defendant
   ... pleaded guilty to a crime that requires a "knowing and willful" attempt to defraud the Government of its tax money; yet, throughout his sentencing hearing, he and his counsel insisted that his acts were merely "neglectful," "inadvertent," and committed without "any disposition to deprive the United States of its due." Remarks of this nature cast considerable doubt on the Government's assertion that petitioner pleaded guilty with full awareness of the nature of the charge. *Id.* 89 S.Ct. at 1173. See also *United States v. Roberts,* 570 F.2d 999 (D.C.Cir.1977), *aff'd,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980):
   [Defendant's] case for withdrawal is further advanced by the fact that he has never admitted his guilt to any of the charges against him. From the time of indictment, he has protested his innocence, and the *Alford* plea he ultimately was persuaded to enter, does not concede any wrongdoing on his part. *Id.* at 1009.

9. *See United States v. Godwin,* 687 F.2d 585, 589 (2d Cir.1982) (failure to explain that Government had burden of proving requisite intent held a violation of Rule 11).

10. In *United States v. Barker,* 514 F.2d 208, 222 (D.C.Cir.), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975), the D.C. Circuit noted that "[a] swift change of heart is itself strong indication that the plea was entered in haste and confusion." We agree.

11. As the Supreme Court explained in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970):
    Here the State had a strong case of first-degree murder against Alford. Whether he realized or disbelieved his guilt, he insisted on his plea because in his view he had absolutely nothing to gain by a trial and much to gain by pleading. Because of the overwhelming evidence against him, a trial was precisely what neither Alford nor his attorney desired. Confronted with the choice between a trial for first-degree murder, on the one hand, and a plea of guilty to second-degree murder, on the other, Alford quite reasonably chose the latter and thereby limited the maximum penalty to a 30-year term.
    *Id.* 91 S.Ct. at 167.

12. Although *Dayton* tells us that something more than a reading of the indictment is indicated only where the charges are complex, the act of entering an *Alford* plea to even simple charges may prove confusing to some defendants. Because of the unique nature of the *Alford* plea itself, judges accepting such pleas must take especial care to ensure that the defendant knows what he is doing; additional explanation of the nature of the plea as it relates to the charges may prove quite helpful in such cases. *See United States v. Roberts,* 570 F.2d 999 (D.C.Cir.1977), *aff'd,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

"[t]here may, however, be room for application of [the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], to inadequate addresses of these matters or to unrelated constitutional errors arising from Rule 11 proceedings." *Dayton*, 604 F.2d at 939. While we believe that the application of the harmless error standard may be appropriate in cases of unrelated constitutional errors, or in complex cases where a simple reading of the indictment does not adequately inform the defendant of the nature of the charges against him, we do not believe that the harmless error standard need be applied in a case like this one where the full text of the indictment was not read to defendant in the judge's presence. Where defendant is not informed of one of the elements of the charge against him, there has been an "entire failure" to address a core concern. As used in *Dayton*, the term "entire failure" does not mean failure to make any mention of the charge whatsoever. It is difficult, if not impossible, to conceive of a Rule 11 proceeding in which a defendant could plead guilty to an unnamed charge. Rather, in a non-complex case, a court fails entirely to personally inform the defendant of the nature of the charges against him when it fails to comply with the requirement that the defendant be read the indictment, or otherwise fails to furnish the defendant the same information he would obtain by hearing the indictment read. Our interpretation of the phrase "entire failure to address a core concern" follows our definition of that phrase in *Dayton*. In *Dayton*, we said:

> [T]he [Supreme] Court held in *McCarthy* that "prejudice inheres" in failure to comply with Rule 11 in its form at the time of that opinion. It happens, as we have also noted, that all the rule then treated were the values lying at the heart of the rule's concerns: absence of coercion, understanding of the accusation, and knowledge of the direct consequences of the plea. The Court was presented there with an entire failure to address the second of these basic pillars of the rule, and it held the omission fatal. We

could not, even if we would, alter that holding. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), had gone before *McCarthy*, but the Court showed no disposition to apply its "harmless beyond a reasonable doubt" formula for review of constitutional error to that Rule 11 context. Nor, logically, can we see how an error inherently prejudicial can be viewed as harmless under any standard of review. Thus, we are bound to conclude, as we do, that such a failure by the trial court to address any one or more of the rule's three core concerns as occurred in *McCarthy* requires automatic reversal.

*Id.* at 939. In *McCarthy*, defendant was told that the charge against him was tax evasion, that it carried a maximum penalty of five years imprisonment and a $10,000 fine, and that by entering a guilty plea he waived his right to a jury trial. In response to the court's inquiries, defendant stated that he fully understood all of these matters. The "entire failure" in *McCarthy* was therefore not a complete failure to mention the charges or ensure that defendant understood them, or their consequences. The legally significant failure in *McCarthy* consisted in the court's failure to apprise defendant that the offense required a "knowing and willful" attempt to defraud the Government of its tax revenues, despite defendant's unwaivering insistence that his acts were merely negligent and inadvertent. *McCarthy*, 89 S.Ct. at 1173. This was the "entire failure" upon which we relied in *Dayton* when we stated that an entire failure to address one of Rule 11's core concerns was inherently prejudicial, and obviated the need for further scrutiny of the omission in the light of the harmless error rule. In our case, as in *McCarthy*, the court failed to inform defendant that the offense required a "knowing" act. In our case, as in *McCarthy*, this omission constituted an "entire failure to address a core concern" as that phrase was defined in *Dayton*. In our case, as in *McCarthy*, application of the harmless error rule is therefore unnecessary.

We recognize that in two cases decided after *Dayton,* this Court has applied the harmless error standard to merely "inadequate" addresses of core concerns. *See Wright v. United States,* 624 F.2d 557, 560 (5th Cir.1980); *United States v. Caston,* 615 F.2d 1111, 1115–16 (5th Cir.), *cert. denied,* 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980). In neither of these cases, however, did we analyze what was meant in *Dayton* by our definition of "entire failure" in terms of the Supreme Court's holding in *McCarthy.* We believe the correct rule is that set out in a more recent analysis of *Dayton,* in *United States v. Adams,* 634 F.2d 830, 838 (5th Cir.1981), where we said:

> Taken together, *McCarthy* and *Dayton* provide a basis for determining the appropriate remedies to violations of Rule 11. In order to further the prophylactic scheme established by the Rule and to insure the most effective and efficient appellate review of purported violations, *McCarthy* requires that defendants whose guilty pleas are taken in procedures *not fully in compliance* with Rule 11 be allowed to replead, without having to show that actual prejudice results from the violation of the Rule. But in order to avoid an "iron rule of review directed at technical and literal compliance" with the many post-*McCarthy* additions to Rule 11, we have held that *McCarthy's* strict enforcement is not mandated where the Rule's "core concerns" are adequately addressed. *United States v. Dayton, supra* at 940.

*Id.* at 838 (emphasis added). It is clear from this passage that Rule 11's core concerns cannot be adequately addressed where the procedures used are not fully in compliance with the Rule. In such cases, defendants are automatically entitled to replead, without having to show that actual prejudice resulted from the Rule's violation. *Adams* indicates that the harmless error standard need only be applied when the court fails to adequately address non-core concerns. However, as we read *Dayton,* the harmless error standard may properly be applied to failures to address even core concerns, where these failures represent nothing more than purely formal, technical and insignificant deviations from the requirements of Rule 11. We do not in our interpretation of *Dayton* seek to fashion a rigid, inflexible standard; in *Dayton,* we made it very clear that errors of this sort were not susceptible to analysis under any simple or mechanical rule. *Dayton,* 604 F.2d at 937–38. Where, however, as here, the court's inadequate address of one of the elements of the charge results in less than full compliance with Rule 11, we can only conclude that there has been an entire failure to address a core concern, warranting automatic reversal of the conviction.[13]

We recognize that the district court throughout these proceedings exhibited considerable concern that Punch be accorded the full protection of the Constitution, and strove to comply with the strictures of Rule 11. Nevertheless, we feel that an error, though inadvertent, was committed. The district court's failure to properly inform Punch of the nature of the charges against him requires automatic reversal of his conviction.

Having disposed of the appeal on this ground, we need not address Punch's additional arguments; that the court failed to inform him of his right to cross-examine the witnesses against him, and that his will was overborne by that of counsel.

---

**13.** Even if we were to apply the *Chapman* standard, we could not under the circumstances of this case say that the error here was harmless. Counsel has indicated by sworn affidavit that he may well have overborne his client's will in persuading him to enter an *Alford* plea. Punch has steadfastly maintained his innocence, and sought to withdraw his plea at the first opportunity. He was sentenced to four years imprisonment. The conclusion is inescapable that this plea was entered without sufficient awareness of what it entailed, and there can be no doubt that Punch suffered substantial prejudice thereby. *See United States v. Almaguer,* 620 F.2d 557, 559 (5th Cir.1980), *cert. denied,* 452 U.S. 907, 101 S.Ct. 3034, 69 L.Ed.2d 408 (1981). Since Punch moved to withdraw his plea before sentencing, the Government would have suffered little, if any prejudice had this motion been granted. *United States v. Roberts,* 570 F.2d 999, 1011 & n. 48 (D.C.Cir.1977), *aff'd,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

Accordingly, we REVERSE the conviction, VACATE the plea of guilty and REMAND with instructions that defendant be permitted to plead anew.